(48 South. 769.)

No. 17,259.

THOMPSON v. SOUTHERN SAWMILL CO., Limited.

(March 1, 1909.)

FRAUDULENT CONVEYANCES (§ 27*)—TRANS-FERS AS SECURITY — PIGNORATIVE CONTRACT —PLEDGE.

In the absence of fraud in fact or in law, a pignorative contract in the form of a sale made in the usual course of business to secure advances, and perfected by a delivery of the property, will be recognized and enforced as a pledge against the creditors of the owner, and against a receiver appointed to administer his insolvent estate.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 66; Dec. Dig. § 27.*]

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by Albert H. Thompson against the Southern Sawmill Company, Limited. Judgment for defendant, and plaintiff appeals. Affirmed.

Charles Francis Borah, for appellant. Foster, Milling & Godchaux and Scarborough & Carver, for appellee.

LAND, J. Plaintiff, as receiver of the Berwick Shipyard & Manufacturing Company (hereinafter styled the "Shipyard Company"), instituted this suit against the Southern Sawmill Company, Limited (hereinafter styled the "Sawmill Company"), to restrain the defendant from shipping or removing certain lumber from the premises of the shipyard company, and to have the same adjudged to be the property of said company free from any claim of ownership or privilege on the part of the defendant, and also to compel the defendant to account for all lumber shipped and removed by it since the appointment of the receiver, and to recover the value of the same.

The defendant answered that it held possession of said lumber by virtue of certain contracts made with the shipyard company, under which it had the legal right to dispose of said lumber, as owner or as pledgee, to secure the payment of large sums of money paid and advanced under said contracts to the shipyard company.

There was judgment for the defendant, and the plaintiff has appealed.

In the year 1906 the Berwick Shipyard & Manufacturing Company established a large sawmill and manufacturing plant at Berwick, La. In December, 1906, the president of the company went to New Orleans, and in that month entered into two several contracts with the Southern Sawmill Company for the sale or disposition of the entire output of the mill not needed in the manufacturing and ship repairing branch of the business.

The first contract, of date December 10, 1906, was an agreement on the part of the shipyard company to sell the by-products of its mill, in ash and cypress lumber below the grades of shop, and cypress shingles and laths, through the sawmill company on the following basis:

"Said Southern Sawmill Company, Ltd., is to procure orders for the lumber &c. herein referred to, at the best possible market prices and when said prices are acceptable to said Berwick Shipyard and Manufacturing Company, Ltd., to consummate the sales and in consideration of which said Southern Sawmill Company, Ltd., is to be allowed a commission of

10 per cent. net amount of invoice after deducting freight; said Berwick Shipyard & Mfg. Co. shall also have the right to sell said product but in which case said Southern Sawmill Co., Ltd., shall receive the said 10 per cent. commission.

"All sales made by either party are to be invoiced through Southern Sawmill Co., Ltd.. who shall be responsible and settle direct with Berwick Shipyard & Mfg. Co., Ltd., for each shipment, provided however that neither party to that agreement shall be privileged to sell to any firm, corporation or individual, who is not a mutually satisfactory financial risk.

"In consideration of the above agreement said Southern Sawmill Co., Ltd., binds and obligates itself to advance to said Berwick Shipyard & Mfg. Co., Ltd., 75 per cent. of the net f. o. b. mill value of the products herein referred to, at the end of each 30 day period, said advance to be made in the following manner, to wit:

"Said Berwick Shipyard & Mfg. Co., Ltd., to make out a bill of sale in the form hereto annexed and attached to same a ninety day sight draft on said Southern Saw Mill Company, Ltd., drawn on them at their domicile, together with insurance policy for at least 80 per cent. of the net f. o. b. mill value of the product or products drawn for.

"Should said product or products not be shipped prior to the maturity of said note or acceptance, then it is mutually agreed by and between the parties hereto that said note or acceptance may be renewed for an additional sixty days, at the option of the buyer.

"Final and full settlement covering each sale and shipment made shall be made by the Southern Sawmill Co., Ltd., on each and every car as shipped or delivered. This contract to remain in force for a period of twelve months, from date."

On December 21, 1906, an absolute bill of sale was executed by the shipyard company in favor of the sawmill company for 243,058 feet of lumber, delivered to Homer Pickett, custodian acting for the latter company, on its leased land, for and in consideration of $2,400 in hand paid.

Similar bills were executed from time to time for other lumber delivered to the same custodian.

On December 31, 1906, another contract was executed between the same parties, by which the shipyard company, called the "seller," agreed to saw and manufacture for the sawmill company, called the "buyer," 5,000,000 feet of cypress lumber in the grades

12ª La.—5

of first and second clear, called "select" and "shop" grades. It was stipulated that the lumber should be of certain dimensions, and as manufactured should be properly piled and cross-sticked on or before the last day of each month, and that the buyer should pay certain prices for the different grades, 75 per cent. on the delivery of the lumber from month to month on the millyards, and the balance on shipment. This contract gave the "buyer" the right to keep the lumber on the yard for six months after delivery, and the necessary ground for such purpose was leased to the "buyer." The contract provided for the branding of the piles of lumber and the delivery of the same to the "buyer's" representative or agent.

Homer Pickett was selected as custodian to represent the sawmill company in receiving, grading, stacking, and marking the lumber. He also, from time to time, took bills of sale for the lumber as it was delivered.

Operations under these contracts continued without interruption or friction until November, 1907, when Albert H. Thompson was appointed receiver of the shipyard company. At the time of his appointment there was on hand a large amount of lumber on the yards. This lumber had been delivered to Homer Pickett from the mill, and had been stacked under his directions. Practically all of this lumber had been included in bills of sale issued prior to the appointment of the receiver. Pickett testified that when the receiver was appointed there was possibly two or three thousand feet of lumber on the yard which had not been stacked according to the contract.

During the year the sawmill company made advances to the shipyard company from time to time in anticipation of the money coming to the latter company under the contracts. These advances were secured by indorsed notes, received and retained as collateral. The advances thus made were

treated as payments on account of all amounts to become due from month to month under the contract. The testimony of defendant's witnesses that notes were held merely as collateral is confirmed by letter from the president of the shipyard company of date August 31, 1907, in which he refers to the notes then outstanding as "collateral over and above the security of the lumber." Plaintiff's witness Brown, former secretary and treasurer of the shipyard company, testified that the notes were to be returned as the lumber was sawed and bill of sale issued. All of these notes were produced by the defendant company on the trial below and filed in evidence.

After the appointment of the receiver, the sawmill company through Homer Pickett shipped and sold lumber to the amount of $13,860.91. The receiver gave the sawmill company credit for freight, commissions, discounts, and labor pursuant to the contracts. Later, the receiver claimed all the lumber on the yards as the property of the shipyard company. It is admitted that a large amount is still due to the defendant company, but the receiver contends that the sawmill company had no rights of ownership, pledge, or privilege on the lumber on the yards when the receiver was appointed.

The contract of December 31, 1906, is clearly a sale or agreement to sell lumber of certain grades to the amount of 5,000,000 feet.

The agreement of December 10, 1906, with the bill of sale attached, is a pignorative contract to secure commissions and advances. By this agreement the sawmill company was entitled to receive all the lumber below a certain grade, all the shingles and laths manufactured by the shipyard company during the ensuing 12 months, and was obligated to make advances on the same at the end of each month. By a supplemental agreement, advances were made prior to the end of the month, with the understanding that they were to be reimbursed in the same manner as the advances specified in the original contracts. The contention of plaintiff's counsel that these advances were independent loans represented by the notes given from time is not supported by the evidence.

When the receiver was appointed, all the lumber then on the yards was in possession of the custodian agreed upon by the parties, and by him held as the representative of the defendant company. In Prude v. Morris, 38 La. Ann. 767, the court said:

"The contract may not, in truth, have been a sale because the price was not fixed and certain; but there is a reality about it. The effect of it was to place Lucius in possession and control of the property under an apparent title, in consideration of Lucius settling for Morris a certain debt.

"It was one of those innominate contracts closely resembling a pledge. After Lucius settled this debt by paying Johnson $1,125. Morris certainly could not have demanded the return of the property without reimbursing Lucius this sum, and the plaintiff, as a creditor of Morris, stands in no more favorable position. Lucius is entitled to reimbursement for the amount he has paid."

In Wang and Cottam v. Finnerty, 32 La. Ann. 94, a sale made to secure a debt and future loans was held, as against judgment creditors of the vendor, to be "an actual and valid agreement, which, although innominate, it would be against good conscience to disregard."

We consider the contracts and bill of sales in this case as innominate contracts to secure advances of money to enable the shipyard company to carry on its business, and that, as advances to a large amount have already been made on the lumber in question, it would be against good conscience to permit the receiver to retake the property without reimbursing the money paid out on the faith of the contracts.

The argument that the receiver occupies a different position from that of the shipyard is without merit. The decisions cited supra

show that creditors cannot disregard such contracts, and the receiver as their representative can have no greater rights.

These contracts were entered into in good faith nearly a year before the appointment of the receiver, and soon after the shipyard company commenced business. Under such a state of facts the receiver took the property subject to existing equities, liens, and incumbrances.

It is therefore ordered that the judgment appealed from be affirmed, and that the plaintiff and appellant pay the costs of appeal.

PROVOSTY, J., takes no part, not having heard the argument.